UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| J.B.,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION;<br><br>Defendant. | 4:25-CV-04247-RAL<br><br>REPORT & RECOMMENDATION |

**INTRODUCTION**

Plaintiff, J.B., seeks judicial review of the Commissioner's final decision denying his application for Social Security disability benefits under Title II of the Social Security Act. Plaintiff seeks an order from this court reversing the Commissioner's final decision denying his disability benefits and remanding the matter to the Social Security Administration for further proceedings. See Docket Nos. 1, 14, & 18. The Commissioner seeks affirmance of the agency's decision below. See Docket No. 17.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The district court has referred this matter to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD LR 83.9.

## FACTS

### A. Procedural History

Plaintiff was 39 years old on the date he alleged he became disabled. Administrative Record ("AR") 30. Plaintiff has a two-year college education. AR241. His past work experience includes being a janitor, a machinist, a correctional officer, and a delivery driver. AR241.

Plaintiff applied for disability benefits on November 17, 2022, alleging a date of disability of January 1, 2022. AR17. Plaintiff was found by the ALJ to have the following severe impairments: osteoarthritis lumbar spine; gout; 5mm nonenhancing lesion in inferior fourth ventricle; binocular vision disorder with diplopia; neurocognitive disorder; anxiety; attention deficit hyperactive disorder (ADHD); and depression. AR20. Plaintiff's claim was denied initially on October 2, 2023, and denied again upon reconsideration on April 19, 2024. AR17.

### B. Medical Evidence

#### 1. June 26, 2021, Emergency Department Visit

On June 26, 2021, plaintiff presented to St. Michael's Hospital in Tyndall, South Dakota, complaining of elevated blood pressure. AR345-46. On arrival, plaintiff's blood pressure was 180/88, which is high.[1] After plaintiff "was more relaxed" his blood pressure lowered to 138/81. Id. Doctors approved of plaintiff discontinuing his Lexapro and recommended that he take his

[1] A top number of 140 or higher places an individual in the stage 2 hypertension category. See Mayo Clinic, *Blood Pressure Chart: What Your Reading Means* (Dec. 24, 2025), https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982.

Vistaril as prescribed for anxiety and that he follow up with his primary care provider. Id.

### 2. Yankton Medical Clinic Records

Plaintiff attended the Yankton Medical Clinic from May 17, 2021, to July 29, 2022. AR350-70. During that time, plaintiff was treated for snoring, sleep apnea, and excessive daytime sleepiness. AR369. Plaintiff was given a CPAP machine[2] and reported afterwards that he slept better and felt better rested. AR362.

### 3. Behavioral Health Records

Between April 21, 2022, and July 31, 2024, plaintiff received treatment from Lewis & Clark Behavioral Health in Yankton, South Dakota. AR371-441. Plaintiff told providers that he had "been dealing with anxiety for 20 years and would like to get help." AR378. Plaintiff noted that he had been taking Paxil for three years, but discontinued use due to side effects. Id. He also discontinued use of Fluoxetine. Id.

Plaintiff revealed that he used marijuana two or three times per day to alleviate his symptoms, and that this had been effective. AR378, 397. He also reported that his 150mg of bupropion had been "amazing" and that "his mood and anxiety have been so much better and that his ability to focus and concentrate is significantly improved as well." AR398. His bupropion was later

[2] CPAP stands for "continuous positive airway pressure." A CPAP machine is a common treatment for sleep apnea that keeps an individual's airways open while they sleep. See Cleveland Clinic, *CPAP Machine* (July 11, 2024), https://my.clevelandclinic.org/health/treatments/22043-cpap-machine.

increased to 300mg daily, and he was prescribed 25mg hydroxyzine twice daily as needed. AR424, 433. He observed that the increased dose may have caused a dissociative episode at work. AR424.

Plaintiff told providers of the problems his anxiety presented him, including panic attacks, shakiness, trouble with concentration, repeating words or phrases on a loop, seizing up, sweating, chest tightening, shortness of breath, and trouble hearing. AR378. Providers diagnosed plaintiff with generalized anxiety disorder and ADHD. AR386. Plaintiff also reported difficulty remembering projects and appointments, avoiding activities that required a lot of thought or attention, fidgeting, being easily distracted, difficulty paying attention, and difficulty organizing tasks. AR378. After beginning a job at Walmart, plaintiff reported that his anxiety increased somewhat. AR415.

Plaintiff indicated that his depression was not severe, denying poor sleep, decreased interest levels, decreased energy, recent changes to appetite or weight, or suicidal ideation. AR397. He also denied any issues with paranoia, hallucinations, delusions, eating disorders, obsessions or compulsions, fears or phobias, mania, or symptoms of PTSD. Id.

Plaintiff was diagnosed with a brain tumor in 2023. AR544. Plaintiff reported that he experienced some additional anxiety, but overall stated that he tolerated his medications well and felt that his symptoms had been well controlled. AR671. At one session on July 10, 2023, plaintiff denied any symptoms of depression, including poor sleep or difficulty with concentration or focus. AR680. At another appointment on October 2, plaintiff reported that

he was managing his anxiety well and denied having any significant anxiety attacks. AR689.

At an appointment on June 13, 2024, plaintiff complained of an increase in depression and anxiety. AR896. He said that he had low levels of motivation and energy and spent a lot of time focusing on future worries and past regrets. Id. While he said that his Wellbutrin had been beneficial, it did not provide relief for his anxiety symptoms. Id.

Plaintiff met with providers again on July 31, 2024. AR905. He again complained of increased depression and anxiety. Id. He had previously been prescribed 30mg of duloxetine daily, and said that his overall mood had improved since starting the medication. Id. He reported that he is "almost back to where he would like to be" and that he was finding enjoyment again in daily activities. Id. While he reported anxiety, he "denie[d] that it's significant enough to cause any impairment in his day." Id.

**4. Horizon Healthcare**

Plaintiff received care from Horizon Healthcare in Yankton, South Dakota, from May 3, 2021, to March 12, 2024. AR463-535. Plaintiff originally began treatment at Horizon Healthcare because he wanted to have his knees evaluated due to weakness and pain in his joints. AR526. Plaintiff also wanted to be seen for anxiety and depression and to see a pulmonologist regarding his sleep apnea. AR526-27. Plaintiff primarily received therapy from Horizon Healthcare over the course of two years. See, e.g., AR523.

During those appointments, plaintiff discussed his anxiety and depression and coping skills for dealing with them. AR503. At one appointment, plaintiff recounted an episode in April 2022 where he became confused, was unaware of his surroundings, and had slurred speech. AR471. At a later appointment, plaintiff complained of a different episode, this one in October 2022. AR760. Plaintiff said that he felt he had suffered a stroke while at work where he was unaware of his surroundings for an undetermined amount of time. Id. Since that episode, plaintiff reported increased confusion, slurred words, unawareness of his surroundings, and double vision on his right side. Id.

At one appointment, plaintiff revealed that he did not take his medication because he did not like the way it made him feel. He rated his anxiety as 3/10 when at home, but 7/10 when in public, and his depression as 7/10. AR786.

**5. Neurology**

In early 2023, plaintiff sought an MRI due to a family history of aneurisms and cognitive problems such as poor mental health, light sensitivity, double vision in his right eye, trouble balancing, and memory issues. AR545. The MRI "show[ed] a roughly 6 mm mass on the floor of the fourth ventricle likely representing a subependymoma versus ependymoma." AR544. In other words, plaintiff had a brain tumor.

Plaintiff was seen again by neurology on September 8, 2023. AR608. Providers examined plaintiff and listened to his symptoms. Under "assessment and plan," a doctor wrote that she wondered whether plaintiff's memory

concerns were more an issue with attention, and that uncontrollable anxiety may be playing a role. AR611. She also wrote that plaintiff suffered from leg numbness/tingling and gait unsteadiness, as well as blurry vision in his right eye. AR611-12.

Plaintiff was seen again on November 7, 2023. AR601. On the notes from the visit, a doctor wrote that they compared the MRI to two previous MRIs from earlier in the year and found a lesion involving the inferior fourth ventricle. Id.

Plaintiff was seen again by neurology on May 23, 2024. AR875. At that appointment, plaintiff detailed his mental health problems. Id. He stated that he suffered from memory issues such as struggling to remember names and reading more slowly. Id. He said he cannot process information as quickly and has some difficulty finding his words. He requires someone else to drive if he is going a long distance. Id. Plaintiff also noted that his right eye had been blurry and hard to focus with for roughly a year. AR876.

Plaintiff also described an episode in October of 2022 where he "felt something was wrong emotionally" and did "not have a recollection [of] a lapse of time." Id. Additionally, plaintiff stated that in March of 2022 he thought he had a panic attack. Id. Plaintiff reported that his anxiety has been worse for the past few years, but that his medication was helping. Id.

**6. Dr. Galen Van Kley Psychological Evaluation**

Dr. Galen Van Kley conducted a psychological evaluation of plaintiff on August 12, 2023. The report outlined plaintiff's medical problems, including: a

brain tumor discovered in January 2023, degenerative disc disease that affects his lumbar and cervical spine area, hypertension, and anxiety. AR589.

Dr. Van Kley observed during the evaluation that plaintiff was anxious, tearful at unexpected times, and would frequently apologize for no apparent reason. AR589-90. Regarding plaintiff's anxiety, plaintiff reported that his racing thoughts often prevented him from sleeping. AR590. Plaintiff described an incident while working at Walmart as a possible panic attack. Id. Dr. Van Kley stated that while plaintiff's speech was clear with no delusional content, plaintiff's internal dialogue was overwhelmingly self-critical. Id.

Dr. Van Kley also analyzed plaintiff's WMS-IV scores.[3] AR593. Plaintiff's memory scores measured in the low-average range, which "would be consistent with his self-described memory problems and indicate that he would very likely notice increased difficulty encoding and retaining new information in both visual and auditory modalities even though his overall memory functioning is not seriously impaired." Id.

Ultimately, Dr. Van Kley diagnosed plaintiff as having a mild neurocognitive disorder due to subependymoma (benign brain tumor), social anxiety disorder, generalized anxiety disorder, and major depressive disorder in partial remission. AR593-94. Dr. Van Kley concluded that plaintiff "would meet criteria for having a neurocognitive disorder, particularly given the decline in

[3] A "WMS-IV" test stands for Wechsler Memory Scale – Fourth Edition. It is a psychological test used to evaluate memory in adults. Pearson, *Wechsler Memory Scale Fourth Edition*, https://www.pearsonclinical.ca/en-ca/weschler/Wechsler-Memory-Scale-%7C-Fourth-Edition/p/P100008238.

memory and functioning and balance issues." Id. He also opined that plaintiff "meets criteria for generalized anxiety disorder along with social anxiety disorder, which was overwhelmingly apparent during the clinical interview." AR594.

**7. Dr. Mark Wolterstorff Appointment**

Plaintiff met with Dr. Mark Wolterstorff on March 28, 2024, for a neuropsychological evaluation. AR879. Plaintiff reported his cognitive issues since 2020, including difficulties with memory, periods of confusion, and time blindness. AR880. Plaintiff described his mood as "depressed, anxious, and recently angry." Id. He reported changes in his personality, including increased apathy and irritability. Id. Dr. Wolterstorff reported that plaintiff was pleasant and cooperative throughout the evaluation and could understand instructions without repetition or clarification, though he was anxious and fidgety throughout and frequently apologized. AR882.

Overall, Dr. Wolterstorff found that plaintiff's testing was "reflective of frontal system dysfunction, with no substantial lateralizing pattern appreciated." AR883. He noted that it was difficult to determine with certainty the degree to which his findings represented a change from prior levels, since plaintiff had no prior cognitive evaluation to provide context. Id.
Dr. Wolterstorff concluded that "suspicion for a neurodegenerative process would be low," and ultimately recommended that plaintiff continue to address "potentially modifiable cognitive risk factors" such as affective distress and to monitor any further changes. AR884.

### C. Non-Medical Evidence

#### 1. Work Activity Report – Employee

Plaintiff filled out a work activity report, outlining his various jobs and wages. AR229. As part of that report, plaintiff was required to list whether he worked under "any special conditions." AR232. He checked the box next to the special condition "allowed to produce less work than other workers," writing in another column: "I feel as if this is true as I am aware that I am much slower than co-workers." Id. He also checked the box next to the special condition "given work that was suited to my condition," writing: "They are good about asking me what work[s] for me [and] adjust as needed." Id.

In a section labeled "remarks," plaintiff wrote "My employer has been very good about trying to help me succeed at my job. They changed some labels in the dispensing area to help me read the number easier (was a large string of numbers and they simplified them). They are always checking up on me and making sure I'm doing OK." AR235.

#### 2. Plaintiff's Function Report

Plaintiff filled out a function report outlining his daily activities and limitations. AR276-85. One section asked "[h]ow do your illnesses, injuries, or conditions limit your ability to work?" AR278. Plaintiff wrote:

> I have episodic confusion, which makes it hard to focus. There was an occasion when I worked at Walmart where I thought I had a severe panic attack at work, where I experienced memory loss, slurred speech, [and] double division. I now believe this was a seizure from my brain tumor. This has happened on several occasions, usually due to high stress [and] blood pressure spike. [I]

> was in the E.R. in Tyndall, [South Dakota] in 2021 for one. Also—neck pain, unsteady gait, memory problems, [and] some minor vision problems.

Id.

Plaintiff also noted that he had difficulty driving because of light sensitivity, panic attacks, and seizures while driving. AR281. He also stated that he had "bizarre personality changes" that caused difficulties in his relationships. AR282. Plaintiff wrote he struggled to bend, reach, or walk due to periods of dizziness and unsteadiness. AR283.

Plaintiff described his daily activities as watching TV, driving his children to school, assisting with housework, taking a long nap, helping with cooking, spending time with his family, caring for his dog, and playing video games. AR279, 282. Plaintiff noted that he was able to manage his own finances. AR281.

### 3. Plaintiff's Wife's Function Report

Plaintiff's wife, A.B., filled out a third-party function report. AR262. In it, she described plaintiff's daily activities. Id. She wrote that she cooks, cleans, and watches television with plaintiff. Id. When asked to describe what plaintiff does from waking up until bed, she wrote: "Gets dressed, gets a drink of water, watches TV, makes [and] eats dinner, reads articles, does laundry, [they both] make supper, watch TV, go to bed." AR263. She also noted that plaintiff helps around the house, caring for their two sons, making meals, driving the kids to school, caring for their dog, mowing the lawn, doing laundry, vacuuming, and shopping for groceries. AR262, 268-69. Plaintiff goes outside daily and can

drive himself. AR269. A.B. also noted that plaintiff can manage his own finances. Id.

When asked about plaintiff's limitations, A.B. wrote that plaintiff "has a hard time following a conversation" and that she often has to repeat herself. AR262. She also noted that plaintiff's memory had deteriorated and that "he asks a lot of questions." Id. When plaintiff is out in public, "he sometimes has panic attacks when around a lot of people." Id. She also wrote that plaintiff has a hard time falling and staying asleep. AR263. Plaintiff required reminders to brush his teeth and take his medicine. AR268. She also recounted an incident where plaintiff had to call an ambulance due to his mental health. Id. While plaintiff used to be able to "speed read," he now complains that he must reread simple numbers and words and has a hard time remembering them. AR270.

In a section labeled "information about abilities," A.B. wrote that plaintiff's disability affected his talking, seeing, concentration, understanding, and memory. AR271. She elaborated that plaintiff often forgets words, has a hard time concentrating, and asks excessive questions. Id. She also noted issues with his vision, stating that plaintiff "mentioned seeing double when looking to the side." Id.

**4. Plaintiff's Pain Questionnaire**

Plaintiff filled out a pain questionnaire on February 13, 2024. AR300. Plaintiff reported daily pain in his lower back, mid-back, neck, and hands, and intermittent pain in his foot and his legs. AR298. Plaintiff reported that some of this pain, such as the pain in his mid-back, neck, and hands, worsens with

physical activity. Id. Under current pain medications, plaintiff listed Aleve, medical cannabis, and prednisone. AR299. He also noted that he obtained temporary relief from his pain by bathing, stretching, walking, and using a heat pad. Id.

### 5. Plaintiff's Vision Questionnaire

Plaintiff filled out a vision questionnaire on February 13, 2024. AR303. In it, plaintiff complained that his right eye had been diagnosed as having binocular vision disorder with diplopia. AR302. He noted that his vision causes him to "almost collide with coworkers daily" and that he has difficulties navigating his home and other settings, even while wearing corrective lenses. Id. He also wrote that he had stopped driving in heavy traffic because of his vision, and that driving at night had gotten more difficult. Id.

## D. Hearing Before the ALJ

A hearing before administrative law judge ("ALJ) Richard Hlaudy was held on December 5, 2024, at which plaintiff, his attorney, and vocational expert (VE) Kent Granat appeared via video.[4] AR38.

At the hearing, plaintiff recounted his work history. AR43-47. He noted that he worked part-time 20 hours a week as a prep chef for Good Samaritan. AR44-45. When asked why he stopped working there, plaintiff responded that he did not "really have a great answer," only that he "was just having a hard time doing it anymore." AR45.

---

[4] The transcript notes state that plaintiff appeared in person; however, that appears to be a typo. AR40. During the hearing, the ALJ stated that he was "conducting a hearing in online video format." Id.

Plaintiff next discussed his part-time work at Walmart. Id. Plaintiff said he discontinued this work because his "back couldn't handle it" and that he "wasn't fast enough to get the orders done." AR45-46. Plaintiff also worked in the kitchen at Casey's for a short time, ultimately leaving because he "had a disagreement on the scheduling" that prevented him from spending time with his children. AR46. Plaintiff also did facilities maintenance and janitorial cleaning at Mount Marty, eventually quitting because he "just decided that [he] had enough." AR46-47.

Plaintiff's lawyer next questioned him about his physical symptoms. AR48. Plaintiff said that he had lower back pain since 2009 for which he had received cortisone shots. Id. The pain had recently grown to include his middle back and neck, and doctors discovered a vertebral hemangioma in his middle back. Id. Plaintiff also stated that he had been diagnosed with gout after experiencing foot and joint pains. Id. The two also discussed plaintiff's medical treatments, which included ice, heating pads, and prednisone. AR50.

Plaintiff said that his gout pain had caused problems with his sleep, with him only sleeping four hours some nights, leading to lots of naps during the day. AR52. Plaintiff recounted that he spent most of his time reading, watching TV, listening to music, playing video games, and spending time with his children. Id. Plaintiff also helped with household chores like mowing the yard and planting flowers, typically for an hour at a time. AR52-53. Plaintiff also swept the floors, helped with dishes, and "help[s] a little with the cooking." AR53.

On the mental side, plaintiff said that he had "been dealing with a lot of severe depression," anxiety, and panic attacks. AR53-54. One panic attack years prior was so severe that he called an ambulance. AR54. These panic attacks sometimes prevent him from engaging in daily activities, like shopping at the grocery store. AR58.

The ALJ next questioned VE Granat. The ALJ presented VE Granat with the following hypothetical:

> Consider a hypothetical person of Claimant's age, education, and past relevant work. This hypothetical individual can lift and/or carry 20 pounds occasionally, 10 frequently, stand and/or carry 20 pounds occasionally, 10 frequently, stand and/or walk six hours in an eight-hour day, and sit about six. Now this person can occasionally climb ramps and stairs, should never climb ladders, ropes, or scaffolds. This individual can occasionally balance as defined in the [Selected Characteristics of Occupations], occasionally stoop, kneel, crouch, and crawl. This person can frequently handle and finger, and must avoid concentrated exposure to vibration. Must avoid all exposure to workplace hazards, such as large moving production machinery or unprotected heights. This individual can maintain concentration, persistence, and pace while carrying out simple instructions, and can tolerate occasional interactions with co-workers, supervisors, and the general public.
>
> Could this person perform claimant's past work?

AR60. VE Granat responded "no" because that job would be above a light level. Id. However, when asked whether such a person could perform any jobs in the national economy, VE Granat provided several possible jobs the hypothetical individual could perform: office helper,[5] clerical checker,[6] and mail sorter.[7]

[5] DOT number 239.567-010, light, SVP: 2.

[6] DOT number 222.687-010, light, SVP: 2.

[7] DOT number 209.687-026, light, SVP: 2.

The ALJ next presented a second hypothetical:

> Consider a hypothetical person of Claimant's age, education, and past relevant work. This person can lift and/or carry 10 pounds occasionally, less than 10 frequently, stand and/or walk two hours in an eight-hour day and sit up to eight. This person can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. This person can occasionally balance, stoop, kneel, crouch, . . . crawl, [and] balance as defined in the SCO. This person can frequently handle and finger. Must avoid concentrated exposure to vibration, and must avoid all exposure to workplace hazards such as large moving production machinery or unprotected heights. This person can maintain concentration, persistence, and pace while performing and carrying out simple instructions, and can tolerate occasional interactions with co-workers, supervisors, and the general public.
>
> Could such a hypothetical person perform any jobs in the national economy?

AR61-62.

VE Granat responded with examples that hypothetical individual could perform: polisher,[8] touch-up inspector,[9] and preparer.[10]

**F. The ALJ's Decision**

On December 20, 2024, the ALJ denied plaintiff's application for benefits in a written decision. AR17-31. The ALJ determined that plaintiff had "acquired sufficient quarters of coverage to remain insured through September 30, 2027." AR17, 19. The ALJ followed the five-step evaluation process for determining whether an individual is disabled under 20 CFR 404.1520(a). AR19-31.

[8] DOT number 713.684-038, sedentary, SVP: 2.

[9] DOT number 726.684-110, sedentary, SVP: 2.

[10] DOT number 700.687-062, sedentary, SVP: 2.

At step one, the ALJ found that plaintiff had been employed following his alleged onset date, earning $2,854.19 in 2022 and $2,115.21 in 2023 as an employee at Walmart. AR19. However, at the hearing, plaintiff testified that he stopped this work activity due to his back and being unable to get the orders done. AR20. As such, the ALJ found that plaintiff's work activity at Walmart was an unsuccessful work attempt and therefore did not qualify as engaging in substantial gainful activity. AR20. Likewise, the ALJ found that plaintiff's work at Casey's and the Good Samaritan Society did not rise to the level of substantial gainful activity. Id. Accordingly, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 2022, the alleged onset date. AR19.

At step two, the ALJ determined that plaintiff had the following severe impairments: osteoarthritis lumbar spine; gout; 5mm nonenhancing lesion in inferior fourth ventricle; binocular vision disorder with diplopia; neurocognitive disorder; anxiety; ADHD; and depression. AR20.

At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. AR20. In making that determination, the ALJ found that the plaintiff had mild limitations in: understanding, remembering, or applying information, based on plaintiff's allegations that he had difficulty with memory generally, following instructions, completing tasks, and taking medications without reminders. AR21. However, those allegations were considered

alongside plaintiff's statements that he could perform simple household chores, prepare simple meals, pay bills, shop, drive, and play video games. Id. Additionally, the psychological consultative examiner noted that WMS-IV testing noted that plaintiff's memory was not seriously impaired, but it had likely declined from what was estimated to be a high-average level of general intelligence, though his mental status examinations noted a generally intact memory. AR21.

The ALJ also found that plaintiff had a moderate limitation in interacting with others. AR22. The ALJ made that determination based on plaintiff's allegations that he "has difficulty getting along with others and spending time in crowds." Id. On the other hand, plaintiff "stated that he could shop, spend time with friends and family, deal appropriately with authority, and live with family." Id. Additionally, the psychological consultative examination showed that plaintiff reported he was able to get along well with others, and his office visits and treatment notes showed that he was cooperative. Id.

The ALJ also found that plaintiff had a moderate limitation "[w]ith regard to concentrating, persisting, or maintaining pace." Id. The ALJ compared the fact that plaintiff said he had limitations concentrating and focusing, following instructions, and completing tasks, with the fact that plaintiff said he can drive, prepare simple meals, watch TV, play video games, manage funds, and use the Internet. Id. The ALJ observed that "[m]ental status examinations showed generally intact attention and concentration, although some showed distractibility and focus issues." Id.

Finally, the ALJ found that plaintiff had a mild limitation in adapting or managing oneself. Id. Plaintiff "asserted that he has difficulties in handling stress, change, and completing some personal care tasks," but also said "that he can care for pets and care for children." Id. Additionally, the record reflected that plaintiff had appropriate grooming and hygiene and generally had a normal mood and affect. Id.

At step four, the ALJ determined plaintiff's residual functional capacity ("RFC"). The ALJ wrote

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant is able to lift and/or carry 10 pounds occasionally and less than 10 pounds frequently. The claimant can stand and/or walk 2 hours in an 8-hour workday and sit up to 8 hours. The claimant can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. The claimant can occasionally balance as defined in the Selected Characteristics of Occupations (SCO) and occasionally stoop, kneel, crouch, and crawl. The claimant can frequently handle and finger. The claimant must avoid concentrated exposure to vibration and must avoid all exposure to hazards, such as large moving production machinery or unprotected heights. The claimant can maintain concentration, persistence, and pace while performing and carrying out simple instructions. The claimant can tolerate occasional interactions with coworkers, supervisors, and the general public.

AR23.

Following his formulation of the RFC, the ALJ observed that "[i]n considering the claimant's symptoms, [he] must follow a two-step process in which it must be determined [(1)] whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and " [(2)] [the ALJ] must evaluate the intensity, persistence, and limiting effects of the

claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." AR23. On the second step, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [an ALJ] must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Id.[11]

The ALJ concluded that while the plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Id. The ALJ then recounted plaintiff's medical evaluations, concluding that each medical professional's assessment was not generally consistent with the evidence of the record, to varying degrees. AR28-29.[12]

Plaintiff had past relevant work as a janitor.[13] AR29. At step four, the ALJ concluded that plaintiff could not "perform past relevant work as actually or generally performed." AR29-30.

[11] This is significant because, as discussed below, plaintiff argues that the ALJ failed to follow Social Security Regulation ("SSR") 16-3p, which mandates this two-step framework. Docket No. 14, at 13-14.

[12] This is significant because, as is discussed further below, plaintiff argues that the ALJ erred by forming his own medical opinion and "playing doctor." Docket No. 14, at 5.

[13] D.O.T. 381.687-018, SVP 2, unskilled, medium, performed at medium heavy. AR29.

At step five, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that plaintiff can perform. AR30. Those occupations included polisher,[14] touch up inspector,[15] and preparer.[16] As a result, the ALJ concluded that plaintiff had not been under a disability, as defined in the Social Security Act, from January 1, 2022, to the date of the opinion, December 20, 2024. AR31.

**DISCUSSION**

## A. Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by "substantial evidence [i]n the record as a whole." 42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)). "[S]ubstantial evidence [is] defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support [the Commissioner's] conclusion.' " Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a

---

[14] D.O.T. 713.684-038, SVP 2, unskilled, sedentary, 8,500 jobs in the national economy. AR30.

[15] D.O.T. 726.684-062, SVP 2, unskilled, sedentary, 12,000 jobs in the national economy. AR30.

[16] D.O.T. 700.687.062, SVP 2, unskilled, sedentary, 14,000 jobs in the national economy. AR30.

rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted). Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination. Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). "[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings," the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the

ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

**B. The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.
>
> **Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments

significantly limit her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments, the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e)-(f); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five. 20 C.F.R. §§ 404.1520(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(g).

## C. Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## D. Assignments of Error

### 1. Whether the ALJ Committed Reversible Error by Formulating a Defective RFC that Relied Upon an Impermissible Medical Judgment

Plaintiff's first contention is that the ALJ "played doctor" by making an impermissible medical judgment. According to plaintiff, "the record contains only two sets of medical opinions: (1) state agency medical consultants opining on [plaintiff's] physical limitations; and (2) state agency psychological consultants opining on [plaintiff's] mental limitations." Docket No. 14, at 7 (citing AR67-77, 79-89). Plaintiff contends that the ALJ rejected both, finding the physical consultants' medical opinions "not persuasive" and the psychological consultants' medical opinions "generally not persuasive." AR28-29. Accordingly, plaintiff claims, the ALJ's RFC formulation is not backed by

persuasive medical opinion. Instead, plaintiff argues that the ALJ reviewed "the record's raw data himself, and he used that unqualified analysis to contrive a detailed RFC based on the medical determinations he reached." Docket No. 14, at 7.

"An ALJ may not 'play doctor,' that is, 'draw improper inferences from the record or substitute a doctor's opinion for his own.' " Kribble v. Kijakazi, 663 F. Supp. 3d 1016, 1027 (E.D. Mo. 2023) (quoting Adamczyk v. Saul, 817 F. App'x 287, 289 (8th Cir. 2020)). "An ALJ draws improper inferences from the record when she relies on her own interpretation of the relevance of ambiguous treatment notes." Id.

The Commissioner responds that "the regulations are clear that it is the ALJ's responsibility to make the RFC finding based on the entire record evidence, not just medical opinions." Docket No. 17, at 8. While "there must be some medical evidence of a claimant's ability to function to support any finding of RFC," Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000), the Commissioner posits that "some medical evidence" need not be a specific medical opinion from a treating or examining physician. Docket No. 17, at 9.

Another district court dealt with a nearly identical situation in Kinsolving v. Berryhill, No. 5:17-CV-00178-LLK, 2018 WL 4603156 (W.D. Ky. Sept. 25, 2018). There, an ALJ gave " 'little' weight to [one doctor's] opinion and only 'partial' weight to [another doctor's] opinion." Id. at *3. In so doing, the court found that "the ALJ essentially rejected every medical opinion in the administrative record concerning what Plaintiff can still do despite his mental

impairments and created and adopted her own medical opinion." Id. The court held that the ALJ was unqualified to do so, citing a case which stated that an ALJ, as a lay person, is not qualified to interpret raw medical data in functional terms. Id. (quoting Nguyen v. Sec'y of Health & Human Services, 172 F.3d 31, 35 (1st Cir. 1999)). Accordingly, the court remanded. Id.

Several other courts have found that where no medical opinion supports the ALJ's RFC finding, the ALJ inappropriately "plays doctor" by interpreting "raw data" and converting his findings into an RFC. Cases are legion supporting that conclusion. See, e.g.,

- Rodriguez v. Sec'y of Health & Hum. Servs., 893 F.2d 401, 403 (1st Cir. 1989) ("Where the record is bereft of any medical assessment of residual functional capacity, this court has found a lack of substantial evidence to support a finding that exertional impairments are not disabling, since the ALJ is not qualified to assess residual functional capacity on the basis of bare medical findings.");
- Whalen v. Kijakazi, No. 3:21CV-24-DAS, 2022 WL 3333487, at *6-7 (N.D. Miss. Aug. 11, 2022) ( "ALJ based his opinion of [claimant's] limitations on raw medical evidence" when he made an RFC finding despite "the medical evidence . . . not address[ing] this functional capacity," thereby requiring remand);
- Connie C. v. Berryhill, No. 5:18-CV-169-BQ, 2019 WL 2516727, at *7 (N.D. Tex. May 30, 2019), adopted, No. 5:18-CV-0169-C-BQ, 2019 WL 2515188 (N.D. Tex. June 18, 2019) (finding ALJ's decision was not

supported by substantial evidence because the record contained no medical opinions about the impact of the plaintiff's mental conditions on her ability to work and the ALJ cited and relied upon raw medical data to formulate the RFC);

- Henderson v. Berryhill, 312 F. Supp. 3d 364, 371 (W.D.N.Y. 2018) (holding that ALJ's RFC finding was improper "in the absence of the medical opinions rejected by the ALJ" and where the ALJ relied upon "raw medical data" in the plaintiff's treatment notes);
- Roberson o/b/o Roberson v. Colvin, No. CV 16-1110, 2017 WL 3118576 (W.D. Pa. July 21, 2017) ("Although there may be instances where the ALJ is able to make a decision regarding a claimant's RFC with respect to mental impairments without an assessment from a physician regarding the functional abilities of a claimant, this is not such an instant.");
- Gregorio C. v. Comm'r of Soc. Sec., 515 F. Supp. 3d 40, 45 (W.D.N.Y. 2021) (remanding where ALJ "impermissibly reviewed the bare medical findings and translated them into functional assessments");
- Ledbetter v. Colvin, No. CIV.A. 2:14-100-TMC, 2015 WL 4878712, at *7 (D.S.C. Aug. 14, 2015) (finding the Commissioner's decision to be unsupported by substantial evidence where the record did "not contain a single opinion from any medical source that indicates plaintiff is functionally capable of performing light work");
- Mitsoff v. Comm'r of Soc. Sec., 940 F. Supp. 2d 693, 703 (S.D. Ohio 2013) ("The ALJ impermissibly relied on her own interpretation of the

medical data of record, and improperly substituted her interpretation in place of the opinions of Plaintiff's treating physician. Under these circumstances, the ALJ's RFC determination is unsupported by substantial evidence.");

- Smiley v. Comm'r of Soc. Sec., 940 F. Supp. 2d 592, 601 (S.D. Ohio 2013) (remanding where ALJ found plaintiff retained the RFC to perform a full range of medium work despite the record "not contain[ing] a single opinion from any medical source that indicates Plaintiff is functionally capable of performing medium work");
- Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998) ("An ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.");
    - But see Gregory F. v. O'Malley, Case No. 2:23-cv-00721-NJK, 2024 WL 2275178, at *4 (D. Nev. May 17, 2024) (holding otherwise); Jennifer S. v. Comm'r of Soc. Sec., 771 F. Supp. 3d 256, 267 (W.D.N.Y. 2025) (same).

This court is persuaded by those opinions and finds that the ALJ erred by translating raw medical data into functional limitations without the assistance of medical opinions.

This error was harmful. The ALJ interpreted the medical data in ways that expanded plaintiff's RFC, and the court has no way of meaningfully reviewing whether those decisions would have been different had the ALJ been

assisted by persuasive medical opinions. For instance, it is unclear from the record whether the ALJ considered or included Dr. Wolterstorff's recommendation that plaintiff "revisit new information multiple times," "complete tasks one at a time," and "take regular breaks" to "prevent lapses in attention." Docket No. 14, at 11 (quoting AR884).

Additionally, while the ALJ limited plaintiff's ability to understand simple instructions in the RFC (AR23), Dr. Wolterstorff recommended plaintiff revisit *all* information that is new, not just information which is complex. Docket No. 14, at 12 (quoting AR884). As plaintiff points out, a difference in that RFC finding could have been outcome determinative. Id. Likewise, the ALJ did not include in the RFC Dr. Wolterstorff's recommendation that plaintiff "complete one task at a time" or his recommendation regarding breaks. Id. at 13-14. These, likewise, could have been outcome-determinative in the ALJ's disability finding.

Because the ALJ committed harmful error, remand is required. On remand, the ALJ should be instructed to support his RFC finding with medical opinions.

**2. Whether the ALJ Committed Reversible Error by Failing to Follow SSR 16-3P's Guidance When Evaluating Plaintiff's Testimony**

Plaintiff next argues that the ALJ violated Social Security Regulation ("SSR") 16-3P when evaluating his testimony. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Oct. 25, 2017). That regulation outlines the two-step process ALJ's must follow when

evaluating an individual's symptoms. Id. First, the ALJ must determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. Id. At step two, the ALJ must "evaluate the intensity and persistence of an individual's symptoms . . . and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." Id.

In conducting that two-step analysis, an ALJ must "consider all of the evidence in an individual's record." Id. Those factors include: (1) claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate his pain or other symptoms; (5) treatment, other than medication, claimant receives or has received for relief of his pain or other symptoms; (6) any measures claimant uses or has used to relieve his pain or other symptoms; and (7) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (the "Polaski factors"). "In evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' " SSR 16-3p.

Plaintiff posits that the record contains testimonial evidence from plaintiff regarding his symptoms' intensity, persistence, and limiting effect, as well as his wife's submitted statement. Docket No. 14, at 15. Plaintiff argues that, despite this "voluminous testimonial evidence," the ALJ acknowledged that testimony only in isolated contexts, including discussing plaintiff's statements regarding his work history, gout symptoms, and social anxiety. Id.

This, plaintiff claims, "lacks the specificity SSR 16-3p requires." Id. at 16. Plaintiff says that the ALJ's entire analysis boils down to a single conclusory statement. Specifically, the ALJ stated that: "[a]s for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because the objective medical evidence does not show clinical findings to support greater limitations than set out in the [RFC]." AR23-24. Plaintiff says that this conclusory statement does not "specifically address [his] testimony regarding his levels of pain, his daily limitations, his inability to work, his mental health symptoms, or his functional restrictions," and that the ALJ did not identify which aspects of plaintiff's testimony were inconsistent with which medical evidence. Docket No. 14, at 16.

The Commissioner responds that "the ALJ is not required to discuss each factor if the analytical framework for evaluating symptoms is recognized and considered." Docket No. 17, at 13. See Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."). Here, the ALJ recited the two-step process and the elements to consider in the proper

evaluation of subjective statements. AR23. Accordingly, the Commissioner argues that the ALJ did not commit reversible error.

The Commissioner is correct. The Eighth Circuit's opinion in Lowe v. Apfel, 226 F.3d 969 (8th Cir. 2000), is instructive. There, "the ALJ referred to the Polaski considerations and cited inconsistencies in the record to support his finding that [claimant's] complaints . . . were not fully credible." Id. at 972. The court noted that "[t]he ALJ was not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting [claimant's] subjective complaints." Id. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (affirming where "[a]lthough the ALJ did not explicitly discuss each Polaski factor in a methodical fashion, he acknowledged and considered those factors before discounting [claimant's] subjective complaints of pain").

The ALJ in defendant's case did exactly what Lowe requires—he "referred to the Polaski considerations and cited inconsistencies in the record." 226 F.3d at 972. First, the ALJ listed the two-step process he was required to follow:

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever

> statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

AR23.

Next, the ALJ found that plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record," in part because "they are inconsistent because the objective medical evidence does not show clinical findings to support greater limitations than set out in the residual functional capacity." AR23.

The ALJ did not end his analysis there. He compared the objective medical evidence with plaintiff's hearing testimony. For instance, plaintiff "alleged that he has difficulty with memory generally, following instructions, completing tasks, and taking medications without reminders." AR21. Despite that, plaintiff "also stated that he could perform simple household chores, prepare simple meals, pay bills, shop, drive, and play video games." Id. The ALJ also discredited plaintiff's statement that "he has difficulty getting along with others and spending time in crowds" because the plaintiff "also stated that he could shop, spend time with friends and family, deal appropriately with authority, and live with family." AR22. Office visits and treatment notes also showed that the plaintiff was cooperative. Id. The ALJ also noted that the psychological consultative examiner noted that WMS-IV testing noted that

plaintiff's memory was not seriously impaired, and that his mental status examinations noted generally intact memory. AR21.

With regard to concentrating, persisting, or maintaining pace, the ALJ noted that while plaintiff "contended that he has limitations in concentrating generally, focusing generally, following instructions, and completing tasks," he "also stated that he is able to drive, prepare simple meals, watch TV, play video games, manage funds, and use the Internet." AR22. Additionally, "[m]ental status examinations showed generally intact attention and concentration, although some showed distractibility and focus issues." Id.

The ALJ also discredited claimant's assertion "that he has difficulties handling stress, change, and completing some personal care tasks" based on the fact that plaintiff "also stated that he can care for pets and care for children." Id. Additionally, the ALJ observed that record evidence showed that plaintiff had appropriate grooming and hygiene and had generally a normal mood and affect. Id.

The ALJ next observed that neurosurgery treatment notes showed that a biopsy of plaintiff's lesion was not recommended, and that providers did not believe the finding was causing plaintiff's current issues. AR24. As for plaintiff's back problems, the ALJ noted that while an MRI of plaintiff's lumbar spine from October 2023 "showed moderate degenerative disc space narrowing and endplate degenerative changes," plaintiff did not have "spinal stenosis or nerve root impingement." Id. "Other imaging of [plaintiff's] cervical and thoracic spine

from that time also noted no cord changes, some degenerative changes, but nothing severe." Id. Plaintiff also deferred a referral to physical therapy. Id.

At a neuropsychological evaluation in March 2024 with Dr. Trevor Wolterstorff, most imaging and testing was normal or unremarkable. AR25. At that evaluation, plaintiff reported that he "functioned independently across all of his activities of daily living." Id. Plaintiff reported improvement to his medication management with a routine and pillbox, and stated that while he had occasional forgetfulness with financial management, he had no significant financial mistakes. Id. Plaintiff also said he "drove without concern." WAIS-IV testing revealed performances falling generally in the low average to high average range. AR25. The ALJ continued that plaintiff's

> performance on tasks of continuous performance was variable, as he performed within expected limits on a task of auditory attention but struggled more with a task of visual attention. Processing speed was variable and ranged from being relatively weak to the average range. Memory was also variable, as his performance on a task of list learning was notable for inefficient learning and relatively weak immediate and delayed recall, however he was generally able to remember and/or recognize the information he was able to learn. He performed within expected limits on task [for] language functioning, visuospatial functioning, and executive functioning, with the exception of a few tasks.

Id. Dr. Wolterstorff also noted other possible contributors to plaintiff's cognitive inefficiencies, including sleep concerns and regular cannabis use. Id. Dr. Wolterstorff indicated that his suspicion of a neurodegenerative process was low. Id.

The ALJ also observed that plaintiff's conditions had improved with medication, specifically Wellbutrin. Id. Plaintiff also reported that bupropion

had been "amazing" and that his mood, anxiety, and ability to focus had all improved. AR27. Plaintiff denied thoughts of suicide and self-harm. Id. In an appointment with Dr. Van Kley, plaintiff performed in the high-average range for general intelligence. Id. Plaintiff denied any significant anxiety attacks or somatic complaints at his appointment with Dr. Van Kley. Id. In January 2023, plaintiff reported that his mood, anxiety, and ADHD symptoms had been well controlled. AR28. At a follow-up in July 2024, plaintiff reported that his overall mood and anxiety had improved since taking duloxetine. Id.

In short, the ALJ did not commit reversible error because his decision demonstrates that "he acknowledged and examined [the Polaski factors] before discounting [plaintiff's] subjective complaints." Lowe, 226 F.3d at 972. The ALJ was not required to discuss each Polaski factor because he recognized and considered the analytical framework. Tucker, 363 F.3d at 783.

Plaintiff also argues that the ALJ erred by conflating plaintiff's "generalized statements with his hearing testimony." Docket No. 14, at 16. "In other words, the ALJ lumped together testimony, function reports, and application materials without distinguishing between them or analyzing the sworn hearing testimony specifically." Id. Plaintiff points to the ALJ's references to plaintiff's written function report, AR21-22, and notes that the ALJ provided no comparable discussion of what plaintiff testified to at the hearing regarding his symptoms and limitations. Docket No. 14, at 16.

This argument is unsupported and unpersuasive. Plaintiff provides no caselaw suggesting that an ALJ is required to give equal weight or word count

to a claimant's testimony as to the claimant's written function report. Accepting plaintiff's argument would ignore the Eighth Circuit's admonition that courts not "nitpick . . . well-reasoned decision[s]." Lane v. O'Malley, No. 23-1432, 2024 WL 302395, at *1 (8th Cir. Jan. 26, 2024).

The court accordingly finds that the ALJ did not commit reversible error by failing to follow SSR 16-3P's guidance when evaluating plaintiff's testimony.

**3. Whether the ALJ Committed Reversible Error by Authoring a Decision that Contains Inconsistent and Nonsensical Language**

Finally, plaintiff argues that the ALJ committed reversible error by "authoring a decision that contains inconsistent and nonsensical language." Docket No. 14, at 18. Plaintiff observes that material inconsistencies in an ALJ decision can warrant remand, Markland v. Colvin, 127 F. Supp. 3d 1031, 1046-47 (E.D. Mo. 2015), and contends that the ALJ's decision in this case had such inconsistencies. Specifically, plaintiff takes issue with the ALJ's statement that "[t]he [ALJ] did not provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 CFR [§] 404.1520b(c) (See, e.g., Exhibit 8F"). AR29. Exhibit 8F is the psychological evaluation conducted by Dr. Galen Van Kley. AR587.

Plaintiff argues that this statement is inconsistent with the rest of the opinion because the ALJ's decision discusses Dr. Van Kley's evaluation at length. See AR26-27. Plaintiff also says that the statement is nonsensical as Dr. Van Kley's report did not trigger 20 C.F.R. § 1520b(c), which outlines evidence which is inherently neither valuable nor persuasive, because Dr. Van Kley's evaluation does not fall into any of the categories outlined in

§1520b(c)(i)-(viii). Finally, plaintiff argues that this error indicates that there were other unspecified pieces of evidence that the ALJ found inherently neither valuable nor persuasive, and his failure to enumerate that evidence leaves this court without the ability to meaningfully review his decision. Docket No. 14, at 20.

The Commissioner appears to concede that the ALJ erred in stating that he would not discuss Dr. Van Kley's evaluation under 20 CFR § 404.1520b(c). Docket No. 17, at 15. However, the Commissioner argues that any error was harmless because the ALJ *did* discuss Dr. Van Kley's evaluation. And in any event, the Commissioner argues, plaintiff fails to identify evidence from Dr. Van Kley's report that he believes the ALJ ignored.

The Commissioner appears to misunderstand plaintiff's argument. Plaintiff does not argue that the ALJ committed reversible error by discussing Dr. Van Kley's report—quite the opposite. Plaintiff's argument is that the ALJ's inconsistent and nonsensical statement demonstrates that there must be some *other* evidence the ALJ considered to be inherently neither valuable nor persuasive, and that the ALJ's failure to identify that evidence leaves this court without the ability to meaningfully review the decision. This is bolstered by the fact that the ALJ wrote "*e.g.*" before citing the report, indicating other evidence was excluded. Docket No. 18, at 5.

Whether the ALJ's error was harmful or harmless is a close call. After all, an ALJ's decision need only be supported by "substantial evidence." Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). And this court must not set aside

an ALJ's decision "based on an arguable deficiency in opinion-writing technique when it is unlikely it affected the outcome." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (quotation omitted). Yet remand is appropriate where an ALJ's decision is insufficient for meaningful appellate review. Scott ex rel. Scott v. Astrue, 529 F.3d 818, 822 (8th Cir. 2008). The court concludes that failure to identify what evidence the ALJ deemed neither valuable nor persuasive under 20 CFR § 404.1520b(c) prevents this court from meaningfully reviewing the ALJ's decision.

Out of an abundance of caution, the court finds that the ALJ committed reversible error. To facilitate this court's meaningful review, the court recommends that the decision be remanded for further administrative proceedings. On remand, the ALJ should be instructed to enumerate which evidence he finds to be inherently neither valuable nor persuasive under 20 CFR § 404.1520b(c).

**E. Type of Remand**

Plaintiff requests reversal of the Commissioner's decision with remand for further development. See Docket No. 14, p. 20. For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record as to the ALJ's formulation of RFC and its consideration of Dr. Van Kley's report under 20 CFR § 404.1520b(c).

Section 1383(c)(3) of Title 42 of the United States Code provides that final decisions made by the Commissioner of the Social Security Administration as to Title XVI benefits shall be subject to judicial review under 42 U.S.C. § 405(g).

"Section 405(g) of Title 42, United States Code, authorizes judicial review of 'any final decision of the Commissioner . . . made after a hearing.' " Efinchuk v. Astrue, 480 F.3d 846, 848 (8th Cir. 2007) (quoting Mason v. Barnhart, 406 F.3d 962, 964 (8th Cir. 2005)). It "authorizes only two types of remand orders: (1) those made pursuant to sentence four, and (2) those made pursuant to sentence six." Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (citing Melkonyan v. Sullivan, 501 U.S. 89, 98-99 (1991)). A sentence four remand "authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.' " Id. (quoting 42 U.S.C. § 405(g)).

"A sentence four remand is therefore proper whenever the district court makes a substantive ruling regarding the correctness of a decision of the Commissioner and remands the case in accordance with such a ruling." Id. A sentence six remand is authorized "in only two limited situations: (1) where the Commissioner requests a remand before answering the complaint . . . or (2) where the new and material evidence is adduced that was for good cause not presented during the administrative proceedings." Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record 'overwhelmingly supports' such a finding." Id. at 1011 (quoting Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992)). "[W]hen a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of 'our

abundant deference to the ALJ,' remand the case for further administrative proceedings." Id. (quoting Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998)).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be supplemented, clarified, and/or properly evaluated under the applicable law. See also Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) ("[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability."). Therefore, a remand for further administrative proceedings so the ALJ can address these issues is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, this magistrate judge respectfully recommends that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four. On remand, this court recommends the Commissioner be directed to (1) support his RFC finding with medical opinions, and (2) enumerate which evidence he finds to be inherently neither valuable nor persuasive under 20 CFR § 404.1520b(c).

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), unless an extension of time for good cause is obtained. FED. R. CIV. P. 6(b)(1), 72(b)(2). Failure to file timely objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Objections must be timely and specific in order to require *de novo* review by the District Court. Id. at 357–58.

DATED this 19th day of August, 2026.

BY THE COURT:

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE